Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 490 | **DATE** | 3/6/2000 |
| **CASE TITLE** | Kallman vs. Tandy Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons, set forth in the attached order, the Court grants Kallman's motion for summary judgment as to liability but denies her motion for summary judgment as to damages. Tandy's motion for summary judgment is denied. The case is set for a telephone status conference on Tuesday, March 14, 2000, at 9:30 a.m. for the purpose of setting a prompt trial date.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | **Document Number** |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | 95 |
| | Docketing to mail notices. | | MAR 9 2000 | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/6/2000 | |
| | | | date mailed notice | |
| OR | courtroom deputy's initials | | OR | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

JUDITH ALTER KALLMAN, )
)
        Plaintiff, )
)
vs. ) Case No. 99 C 490
)
TANDY CORPORATION, )
)
        Defendant. )

DOCKETED
MAR 09 2000

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Judith Kallman, claiming to have succeeded to the lessor's interest in a lease guaranteed by defendant Tandy Corporation, has sued to recover damages arising from the default of the tenant. The Court has jurisdiction under 28 U.S.C. §1332(a). Both Kallman and Tandy have moved for summary judgment.

### Facts

The case concerns a sublease of commercial property located at 1224-26 Ogden Avenue in Downers Grove, Illinois. In 1959, a company called All-States Ohio, Inc. leased the Downers Grove property to Robert Hall Clothes, Inc. In 1964, title to the property was transferred to Morgan Guaranty Trust Company. In 1973, Robert Hall subleased the property to Parknat Properties, Inc., which was controlled by Irwin Kallman, a real estate lawyer and plaintiff's husband.

The lease that is the subject of the suit is a sub-sublease between Parknat and Color Tile, Inc., dated February 5, 1974 ("Color Tile sublease"). Color Tile leased the property for a term of

15 years, with the right to renew for an additional 10 year term. Defendant Tandy Corporation guaranteed Color Tile's obligations under the lease, including any extension or renewal.

In 1977, Robert Hall filed for bankruptcy. In October 1977, an agreement was made (and was later approved by the bankruptcy court) concerning Robert Hall's lease of the Downers Grove property and other properties. The parties to the agreement were United Merchants and Manufacturers, Inc. (UMM), Robert Hall's parent company, which had also filed for bankruptcy; Morgan and other entities that owned properties leased by Robert Hall (the "Landlords"); Robert Hall and various affiliated entities (the "Tenants"); and Parknat, Parkvan Properties, Inc., Jonpat Management Corp., and Vanderpark Properties, Inc. (the "Subtenants"). The effect of this agreement is one of the key disputed issues in this case.

The agreement recited that Morgan and the other Landlords were the lessors of various Robert Hall clothing stores pursuant to various leases, all of which were guaranteed by UMM; that the Subtenants (including Parknat) had subleased certain of the stores; and that UMM and the Tenants had filed for bankruptcy. The agreement further recited that UMM, the Tenants, Morgan, and the other Landlords wished to cancel the leases and transfer to Morgan and the other Landlords all of the Tenants' and UMM's interests in the leases and subleases. The agreement stated that the Subtenants (including Parknat) wished to release UMM and Robert Hall and the other Tenant entities from their obligations under the subleases, upon the satisfaction of certain conditions.

Simplifying the agreement somewhat, and focusing on the Downers Grove property, the agreement provided that Robert Hall would surrender to Morgan possession of the property and its interest in its lease, "subject to any rights of the Subtenants," namely Parknat. In return,

2

Morgan would pay a sum of money to purchase Robert Hall's interest in the lease. Robert Hall's lease (and other similar leases in other locations) would be canceled as of the date vacant possession was delivered to Morgan. Parknat, as Subtenant, consented to the cancellation of Robert Hall's lease and to the release of Robert Hall's obligations under the sublease to Parknat; however, this consent and release would take effect only if "the various Subtenants and Morgan and such Landlords shall have entered into new leases in respect of each of the Premises on terms and conditions satisfactory to such Subtenants and Morgan and such Landlords."

On November 9, 1977, Morgan entered into a lease of the Downers Grove property to Parkvan Properties, Inc. Parkvan was controlled by Irwin Kallman but was a separate corporation from Parknat. Neither party has explained why the property was leased to Parkvan and not to Parknat, when it was Parknat that had previously subleased the property from Robert Hall and in turn had subleased it to Color Tile. As for Color Tile, however, things evidently proceeded as if nothing had changed. Color Tile did not enter into a new sublease with Parkvan. Indeed, in 1988, Color Tile exercised its right to renew the sublease with Parknat and extended it for a 10 year term, through April 30, 1999.

In 1986, Parkvan assigned to Irwin Kallman its rights under the lease from Morgan, and in 1988, Irwin assigned his rights to Judith Kallman. Also in 1986, Parknat assigned to Irwin its interest in the Color Tile sublease. Irwin has stated in an affidavit that he thereafter assigned to Judith his interest in the Color Tile sublease, but it is not clear whether, prior to the lawsuit, there was any documentation to confirm this. Presumably when this was pointed out to Irwin during the course of the litigation, Irwin executed a document entitled "Amended Assignment of Leases," dated January 20, 2000, stating that he had intended to assign his interest in Color Tile

3

sublease to Judith in 1988 and making the assignment, effective as of 1988, to the extent that it had not previously been accomplished.

In April 1988, Morgan quitclaimed its interest in the property to Leon Charney, who in turn quitclaimed his interest to Judith Kallman. This left Judith as the owner of the property; the holder of Parkvan's leasehold interest; and (at least as of January 2000) the holder of Parknat's interest in the Color Tile lease.

As stated earlier, the Downers Grove property was leased to Color Tile through April 1999. At some point prior to 1996, Color Tile subleased part of the property to TJ's Restaurant but continued to occupy the rest of the property. In early 1996, Color Tile filed for bankruptcy. It vacated its portion of the property on February 1, 1996 and stopped paying rent. On February 21, 1996, the bankruptcy court entered an order rejecting Color Tile's lease of the property as of February 1, 1996. WIN Properties, Inc., another Kallman-affiliated entity that manages the property, entered into a month-to-month lease with TJ's for its portion of the property and eventually executed a long term lease with TJ's. However, WIN was unsuccessful in leasing Color Tile's portion of the property until October 15, 1998, when it executed a lease with an entity called Happiness Is Pets.

Tandy had guaranteed Color Tile's obligations under its sublease. Kallman has sued Tandy to recover unpaid rent through April 1999 not recouped from TJ's or Happiness Is Pets, totaling around $188,000, as well as expenditures that she claims to have made for repairs and maintenance to enable her to relet the property, totaling around $78,500.

Kallman has moved for summary judgment, arguing that Tandy's obligations under its guaranty are undisputed, that she made reasonable efforts to mitigate her damages, and that she is

4

entitled to judgment as a matter of law for all the unpaid rent and her repair expenses. Tandy has cross-moved for summary judgment, arguing that the Color Tile sublease (the only obligation that Tandy guaranteed) was canceled by operation of law in connection with the previously referenced October 1977 agreement, and also that Judith Kallman is not the successor in interest to the Color Tile sublease. We will deal with Tandy's motion first.

## Tandy's summary judgment motion

According to Tandy, when Morgan leased the property to Parkvan (and not to Parknat) following the October 1977 agreement, Parkvan effectively supplanted Parknat. Parknat's lease, Tandy says, was canceled by virtue of the October 1977 agreement and by operation of law. Tandy acknowledges that Color Tile remained in the Downers Grove property but contends that legally Color Tile was no longer a subtenant under the lease from Parknat but rather was a tenant at will, with Parkvan as its landlord. Because Tandy only guaranteed Parknat's sublease to Color Tile, if Tandy is right, then it is entitled to judgment in its favor. Kallman argues that Parkvan did not supplant Parknat and that Parknat's sublease to Color Tile remained in effect. She relies on language in the October 1977 agreement which she says preserved the rights of the then-subtenants, including Parknat.

Our resolution of this dispute turns on our construction of the October 1977 agreement. The parties agree that Illinois law applies. In Illinois as elsewhere, our construction of the agreement, absent ambiguity, must be based on the agreement itself, and not on extrinsic evidence. *E.g., Omnitrus Merging Corp. v. Illinois Tool Works, Inc.,* 256 Ill. App. 3d 31, 34, 628 N.E.2d 1165, 1167 (1994). Though the parties appear to construe the key portion of the agreement differently, this by itself does not mean that an ambiguity exists. *E.g., Johnstowne*

5

*Center Partnership v. Chin*, 99 Ill. 2d 284, 287, 458 N.E.2d 480, 481 (1983). It is only if an agreement is *reasonably* susceptible of varying interpretations that it is deemed to be ambiguous. *Omnitrus*, 256 Ill. App. 3d at 34; 628 N.E.2d at 1167. For the reasons stated below, we do not believe that the agreement is ambiguous. Its interpretation is therefore susceptible to being determined as a matter of law. *Id.; see also, e.g., Winter v. Minnesota Mutual Life Insurance Co.*, 199 F.3d 399, 406 (7th Cir. 1999).

Tandy relies primarily on language in the agreement stating that Robert Hall's lease was being canceled. It relies on Illinois cases holding that if a lease is canceled then any subleases are deemed canceled by operation of law. *E.g., Arendt v. Lakeview Courts Associates*, 51 Ill. App. 3d 564, 366 N.E.2d 1096 91977). As Kallman points out, however, in those cases no effort was made in canceling the leases to preserve the rights of subtenants. Here the opposite is true. Paragraph 2, the clause of the agreement that stated that Robert Hall's lease was to be canceled specifically provided that Robert Hall's relinquishment of its interest was "subject to any rights of the Subtenants," including Parknat. In addition, paragraph 13, in which the subtenants (including Parknat) consented to the cancellation of Robert Hall's leases and the release of Robert Hall's obligations under its subleases with the subtenants, conditioned this on Morgan's execution of new leases with the "various Subtenants."

The effect and obvious intent of the October 1977 agreement was to remove Robert Hall from the chain of leases on each of the properties but to keep everything else intact. Indeed, if Morgan had thereafter leased the property to Parknat, there would be no serious issue as to the continuing viability of Parknat's sublease to Color Tile. The effect would have been simply to eliminate Robert Hall from the chain of leases and subleases, altering the chain as follows:

Before: Morgan Guaranty ----> Robert Hall ----> Parknat ----> Color Tile

After: Morgan Guaranty ------------------------> Parknat ----> Color Tile

The only reason there is even an issue about the effect of the October 1977 agreement is that for reasons unknown, Morgan did not make a new lease with Parknat, the existing subtenant, but rather leased the property to Parkvan. Did this render Parknat's sublease to Color Tile a nullity? We think not. Because the cancellation of Robert Hall's lease was expressly made subject to the existing rights of subtenants, including Parknat, the cancellation of Robert Hall's lease did nothing to affect Parknat's interest in the property. It is perhaps an oddity that one entity is the lessee of the property and another related entity is the sublessor, but nothing in the October 1977 agreement terminated Parknat's interest in the property or its sublease to Color Tile.[1] Nothing in the agreement indicates an intention to alter the legal rights of the subtenants; to the contrary, the agreement carefully sought to preserve their rights as Robert Hall was being excised from the chain of leases for each property.

For these reasons, we reject Tandy's argument that Parknat's sublease to Color Tile was canceled by operation of law or otherwise.

We likewise reject Tandy's argument that Judith Kallman is not the real party in interest.

---

[1] Tandy likewise gains nothing from Paragraph 13 of the agreement, in which the subtenants (including Parknat) consented to the cancellation of Robert Hall's leases and to the release of Robert Hall's obligations under their subleases. Even if this could somehow be construed as effectively canceling Parknat's sublease as subordinate to the Robert Hall leases that were being canceled, the consent was conditioned on Morgan's execution of new leases with "the various Subtenants." The only reasonable construction of this latter clause is that the consent would not take effect until the *then*-subtenant executed a new lease with Morgan, which never took place here (as Morgan leased the property to Parkvan, not Parknat). Nothing in the agreement suggests that the existing subtenants were agreeing to give up their rights upon Morgan's decision to lease the properties to some other subtenant.

Even if the Kallmans had failed to properly document the assignment of the Color Tile sublease in 1988, the January 20, 2000 instrument effectively assigned the sublease from Irwin to Judith at that time. Tandy argues only that it is improper to regard an after-the-fact document as memorializing what occurred at some earlier date. Even if we were to agree with that proposition, and that Irwin's interest in the Color Tile sublease had not previously been transferred to Judith, the January 2000 document was effective to make the assignment. Assuming the Color Tile sublease remained valid and in effect, as we have held, we know of no reason why Irwin could not assign his interest in that sublease to Judith earlier this year, thus giving Judith the present right to enforce Tandy's guaranty of the sublease.[2]

We have considered the remainder of Tandy's arguments and have determined them to be without merit. Tandy's motion for summary judgment is denied.

### Kallman's summary judgment motion

Having held that the Color Tile sublease remained effective, and that Judith Kallman holds the sublessor's interest in that sublease, the only issue remaining to be decided is whether Judith is entitled to summary judgment for the unpaid rent and repair and maintenance costs that she seeks. Damages in a case of this type consist of the rents owed, plus costs incurred in obtaining and maintaining a mitigating lease, less a credit for rents obtained under a mitigating lease. *See In re Handy Andy Home Improvement Centers, Inc.*, No. 95 C 21655, 1998 WL 603252, at *4 (Bankr. N.D. Ill. Sept. 11, 1998); *Pioneer Trust & Savings Bank v. Zonta*, 96 Ill.

---

[2] Even if the real party in interest at the outset of this case was Irwin Kallman, and not Judith Kallman, there is no argument that this would have destroyed diversity jurisdiction. As indicated in their depositions, Irwin and Judith reside together and are both citizens of New York; Tandy is deemed a citizen of Delaware and Texas.

8

App. 3d 339, 345, 421 N.E.2d 239, 245 (1981). Tandy argues that Kallman has failed to establish as a matter of law that she took reasonable efforts to mitigate her damages and also argues that it cannot properly be held responsible for payment of the repair and maintenance costs.

Under Illinois law, "a landlord . . . shall take reasonable measures to mitigate the damages recoverable against a defaulting lessee." 735 ILCS 5/9-213.1. Under this statute, the landlord bears the burden of proving that she met her duty to mitigate. *St. Louis North Joint Venture v. P&L Enterprises, Inc.*, 116 F.3d 262, 265 (7th Cir. 1997) (Illinois law). *St. George Chicago, Inc. v. George J. Murges & Associates, Ltd.*, 296 Ill. App. 3d 285, 293, 695 N.E.2d 503, 509 (1998); *Snyder v. Ambrose*, 266 Ill. App. 3d 163, 166, 639 N.E.2d 639, 640-41 (1994). The landlord has the duty to use reasonable diligence and ordinary care in attempting to minimize her damages; damages that could have been reasonably avoided are not recoverable. *St. George Chicago*, 296 Ill. App. 3d at 293, 695 N.E.2d at 509. However, the landlord's failure to mitigate is not a complete bar to her recovery of damages; rather, it operates as a reduction of the amount recoverable. *Id.* Specifically, the amount of loss that the landlord reasonably could have avoided by reasonable mitigation efforts is subtracted from the amount that she otherwise would be able to recover. *Id.*, citing Restatement (2d) of Contracts §350, comment b, at 127 (1979).

Tandy says that Kallman did not make reasonable efforts to mitigate her losses after Color Tile vacated, for several reasons: she took too long to hire a listing agent; she failed to make repairs which would have enhanced the property's value to potential tenants and improved her ability to relet the property; and she asked for an unreasonably high rental rate.

9

As indicated earlier, Color Tile vacated the property on February 1, 1996, after it had filed for bankruptcy. On February 21, 1996, the bankruptcy court entered an order rejecting the lease effective as of February 1. On March 22, WIN Properties, Inc., Kallman's managing agent for the property, entered into a month-to-month lease with TJ's Restaurant, a subtenant that had been leasing part of the property. WIN negotiated with TJ's for a long term lease, which TJ signed in October 1998. In order to obtain the lease with TJ's, Mirandi says, Kallman agreed to replace the building roof and resurface the parking lot.

Also in March, WIN started looking for a broker to list the part of the property that Color Tile had occupied. It began negotiating with C.B. Commercial Real Estate Group, Inc. in late March or early April and entered into a listing agreement with C.B. Commercial on May 31, 1996. Though it is not clear exactly when C.B. Commercial began active efforts to list the property, its efforts included putting up a sign, sending information to other brokers, soliciting businesses to look at the property, and calling on other businesses in the area to try to find possible prospects. C.B. showed the property to around 40 prospective tenants and kept WIN Properties apprised of the serious prospects. Negotiations with at least two prospects got serious enough that draft leases were prepared, but none of these negotiations were successful through October 1998.

Thomas Mirandi, WIN's director of leasing, and Nicholas Peters, the agent with C.B. Commercial responsible for marketing the property, say that C.B. Commercial was authorized to, and tried to, lease the property for $10 to $12 per square foot, which Peters says was the then

10

current market price for similar properties.[3] Peters says he does not believe that this range of rates deterred prospective tenants, but he provides no real support for this conclusion. Peters and Mirandi say that several prospects found the space too large for their needs and that others were turned off because the property was in disrepair. Eventually, in October 1998, the part of the property that Color Tile had occupied was leased to Happiness Is Pets for $11 per square foot. Mirandi says that to convince Happiness Is Pets to lease the property, Kallman had to agree to replace the existing heating, ventilation and air conditioning (HVAC) units at the property. According to Peters, based on his experience and knowledge of market conditions at the time, it was not uncommon to need over two years to relet such properties.

The Court concludes that there are genuine factual issues that preclude entry of summary judgment in Kallman's favor as to damages, specifically with respect to the issue of mitigation. First, there is evidence suggesting that Kallman's failure to perform certain basic repairs and maintenance to make the interior of the property more presentable to prospective tenants may have contributed to her difficulties in reletting the property. This is suggested by, among other things, the affidavits of Kallman's own witnesses, Mirandi and Peters, both of whom indicate that a number of prospects were turned off by the poor appearance and condition of the property. Kallman argues that she was willing to make improvements as part of a replacement lease but did not want to do so without having a likely replacement tenant. We cannot determine without a trial whether her position hampered her ability to relet the property.

---

[3] The listing agreement stated that the property was to be offered at $12 per square foot or on terms acceptable to the owner. In light of our ruling on Kallman's summary judgment motion, we need not attempt to reconcile these apparently conflicting statements.

11

Second, we cannot say that the nearly four month delay between Color Tile's vacating of the property and the signing of a listing agreement was reasonable as a matter of law. We have not been given an explanation as to why this took so long; all Kallman has done is to say how long it took and claim in conclusory fashion that this was reasonable. Common sense would suggest that entering into a listing agreement is a relatively uncomplicated task that should not have taken so long; our common sense view may be wrong, but if so, it was incumbent on Kallman to provide an explanation. As we have no basis to conclude that this delay was immaterial, this issue will have to be determined after a trial.

Third and perhaps most importantly, Kallman listed the property at a higher rental rate than the $9.85 that Color Tile had been paying: according to Peters, $10 to $12 per square foot; according to the listing agreement, $12 or other terms acceptable to Kallman. The fact this may have been the market rate at the time and that Peters does not "believe" that any prospects were turned off, does not foreclose inquiry into this issue. In fact, under Illinois law, a lessor's attempt to relet property at a rate higher than the vacating tenant had been paying is considered unreasonable for purposes of the mitigation analysis. *MBC, Inc. v. Space Center Minnesota, Inc.*, 177 Ill. App. 3d 226, 234-35, 532 N.E.2d 255, 260-61 (1988). This conclusion was not altered, the court said, by the fact that the landlord's broker recommended asking for more rent than the former tenant had been paying, or by the fact that the rate the landlord sought was the market rate. *Id.* Though we recognize that another court in this district seems not to have followed *MBC, see American National Bank & Trust Co. of Chicago v. Hoyne Industries, Inc.*, 738 F. Supp. 297, 302 (N.D. Ill. 1990), absent some indication (which we find lacking) that the Illinois Supreme Court would not follow *MBC*, we are not free to disregard Illinois law in a

12

diversity case.[4]

This does not mean that it would be appropriate to enter summary judgment against Kallman. First, it may be that there is an explanation for the higher-than-Color Tile offering rate that establishes that the rate was not truly higher – for example, differences between the terms of the Color Tile sublease and what Kallman was offering to replacement tenants – or that the difference was so small as to be immaterial. Second and perhaps more importantly, because failure to mitigate only reduces, and does not eliminate, the plaintiff's recovery, it remains to be determined how much of a reduction (if any) is called for as a result of her failure to offer the property at Color Tile's rental rate. As the court in *Hoyne Industries* did correctly note, even if the landlord acted unreasonably in attempting to relet the property at a rent higher than that charged to the former tenant, it must still be determined whether and how soon the property could have been relet at the former tenant's rate. *Hoyne Industries,* 738 F. Supp. at 302. It may be (though it is doubtful) that the property could have been relet immediately or almost immediately at Color Tile's rate, in which case there is likely to be a substantial reduction in Kallman's recovery; on the other hand, it may be that the property would not have been relet even at Color Tile's rental rate, in which case there will be no reduction. However, these are questions that the Court will be able to answer only after a trial; neither party is entitled to summary judgment on this point.

This leaves only the issue of Kallman's right to recover for the replacement of the roof

---

[4] When the Seventh Circuit considered the appeal from the eventual bench trial in *Hoyne Industries,* it said exactly this, albeit in an unpublished opinion. *See American National Bank & Trust Co. of Chicago v. Hoyne Industries, Inc.,* No. 90-2908, 1992 WL 116375 (7th Cir. June 1, 1992).

13

and the HVAC units and the resurfacing of the parking lot. Kallman is entitled to recover expenses reasonably incurred to mitigate her damages. *See Handy Andy*, at *5; *Pioneer Trust*, 96 Ill. App. 3d at 346, 421 N.E.2d at 245. She may recover as mitigation expenses those capital costs necessarily expended to obtain successor tenants, but she may not recover capital costs that represent long term capital improvements yielding a betterment to the leasehold. *See Handy Andy*, at *5; *Pioneer Trust*, 96 Ill. App. 3d at 346, 421 N.E.2d at 245; *In re Andover Togs, Inc.*, 231 B.R. 521, 537 (Bankr. S.D.N.Y. 1999), absent some term in the lease that requires the tenant to pay for such expenses.

Kallman argues that she had to replace the roof and the HVAC units and resurface the parking lot in order to attract new tenants; Mirandi states in his affidavit that TJ's and Happiness Is Pets insisted on these improvements in the negotiations that led to their execution of leases for the property. All of these repairs, however, appear to involve some betterment of the value of the leasehold beyond the terms of these leases. The terms of the Color Tile lease aside, the line between recoverable and nonrecoverable expenses is not an easy one to draw, and it is one that the Court does not feel comfortable drawing without hearing at trial evidence directed to the issue at trial.

Kallman claims that the expenses are, under the Color Tile sublease, properly charged to the tenant and thus to Tandy as guarantor. Section 5.01 of the lease provides that

> Section 5:01. Repairs.   Lessee shall, at its own expense, keep
> all buildings or improvements now or hereafter placed on the demised
> premises during the lease term in good order and repair; Lessee shall
>         , be liable for repair to the roof and for any structural failure
> of the building.

Lease §5.01 (spacing as in original). Tandy argues that the lease copy provided with Kallman's

14

motion has not been properly authenticated and that due to the readily-apparent deletion, the Court should not consider the copy unless and until Kallman produces the original. Kallman responds that the lease is an admissible business record under Federal Rule of Evidence 803(6). We agree that the lease qualifies under Rule 803(6), but that does not solve the problem identified by Tandy. The real issue is whether the document has been properly authenticated as required in the original document rule (sometimes called the "best evidence" rule) found in Federal Rule of Evidence 1002. That rule does not make copies inadmissible, but where as here the authenticity of a copy is challenged, the party offering the copy must lay a proper foundation for its admission. *See* Fed. R. Evid. 1003, 1004. As Kallman has not yet done that, we cannot make a final determination of issues relating to this particular term of the lease. As an aside, it seems likely that Tandy itself, as guarantor of the sublease, would have been provided with a true copy at the time it signed the guaranty. Thus Tandy itself may have an accurate copy of the document.

Even if, however, Kallman had established a proper foundation under Rules 1003 and 1004 for admission of her copy of the sublease, we would not be able to rule as a matter of law that the repairs for which she seeks compensation were within the terms of what the tenant was required to pay. The lease requires the tenant to pay for repair of the roof; here the roof was replaced, not simply repaired. The difference may be significant. *See Sandelman v. Buckeye Realty, Inc.*, 216 Ill. App. 3d 226, 230, 276 N.E.2d 1038, 1040 (1991). Moreover, it does not appear that the costs of replacing the HVAC units and resurfacing the parking lot would be covered under Section 5.01. That does not mean they are not recoverable; Kallman may be able to establish that they were reasonable and necessary mitigation expenses as opposed to

15

improvements for the betterment of the value of the leasehold. That, however, is an issue that we have already ruled can only be decided after a trial.

## Conclusion

For the foregoing reasons, the Court grants Kallman's motion for summary judgment as to liability but denies her motion for summary judgment as to damages. Tandy's motion for summary judgment is denied. The case is set for a telephone status conference on Thursday, March 9 at 10:30 a.m. for the purpose of setting a prompt trial date.

MATTHEW F. KENNELLY
United States District Judge

Date: March 6, 2000